UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| **DANIEL L. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:13-cv-425-WTL-DKL** |
| | ) | |
| **PRESSTIME GRAPHICS, INC.,** | ) | |
| **OSLER INSTITUTE, INC., and** | ) | |
| **JOSEPH H. SELLIKEN, JR.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### PLAINTIFF'S BRIEF IN SUPPORT OF
### MOTION FOR ATTORNEYS' FEES AND COSTS

Plaintiff, Daniel L. Brown ("Brown"), by counsel, files his Brief in Support of Motion for Attorneys' Fees and Costs against Defendants Presstime Graphics, Inc., Osler Institute, Inc. and Joseph H. Selliken, Jr. (together "Defendants").

### INTRODUCTION

On November 14, 2016, following trial in this Fair Labor Standards Act ("FLSA") and Indiana Wage Payment Statute ("IWPS") case, the jury reached a unanimous verdict in Brown's favor and against all Defendants.   On December 1, 2016, the Court entered judgment for Brown in the amount of $171,345.76.   [Docket No. 136].   Brown now brings his Motion for fees and costs.   For three years, Brown's counsel has litigated this action on a contingency basis and advanced all litigation expenses and costs incurred on behalf of Brown.   Defendants have opposed and tenaciously litigated Brown's claims, necessitating the fees and costs that accrued during discovery, motion practice and trial. Given the overwhelming success of this action, Brown's counsel now requests an award

of $161,044.50 in attorneys' fees, plus reimbursement of litigation costs and expenses in the amount of $2,062.72.   This amount is in addition to the costs sought by Plaintiff in his Bill of Costs, which seeks taxable costs pursuant to 28 U.S.C. § 1920 in the amount of $1,950.12 and will be filed by separate motion.   (Brown seeks total costs and expenses in the amount of $4,012.84).   The requested monetary amounts are particularly reasonable in light of the Defendants' strategy to litigate as aggressively as possible, refusal to offer any settlement amount that even remotely reflected the value of Brown's claim, the significant amount of work done, and the extraordinary results achieved.   Specifically, Brown's counsel secured monetary damages for Brown equivalent to 5,471.42 hours of unpaid overtime worked during the 149-week time period December 11, 2010 through October 22, 2013.   [Exhibit A, Verdict Form].   Based on these figures, the Jury found that Brown worked an average of 36.72 unpaid overtime hours per week (5,479.42 overtime hours / 149 weeks) during each week of his employment.   This is equivalent to working an average of 76.72 total hours per week (40 regular hours + 36.72 overtime hours).   Id.

## RELEVANT BACKGROUND

From the inception of this case through the present, Brown's Counsel have efficiently and successfully litigated this case, which has been hard fought at every stage due to Defendants' refusal to acknowledge its wage and hour practices violated Brown's rights.

Brown filed this lawsuit against Defendants on December 11, 2013.   It was necessary and proper to file suit against three defendants.   Selliken hired Brown to

2

clean up and maintain a large, abandoned property that Selliken obtained as an investment for the Osler Institute.   At all relevant times, Selliken directed Brown's day-to-day work activities, either directly or through his agent Corey Bradbury. Although Selliken created a separate corporation with respect to this property and its future business operations ("ABBA") and appointed a president for the corporation (Corey Bradbury) who supervised Brown for the first 84 weeks of his employment, ABBA generated no income and thus had no revenue to pay wages or expenses.   Selliken's solution to this problem was to utilize the respective payrolls of the Osler Institute and Presstime Graphics to pay Brown and reimburse Brown's business expenses related to ABBA, despite the fact that Brown performed grounds keeping and maintenance work solely for ABBA during the first 84 weeks of his employment.   This unorthodox employment arrangement made litigation of this case more complex because of certain unique FLSA coverage and employer-employee issues it presented.   Although Defendants ultimately stipulated to these coverage issues, they did not do so until the Final Pre-trial Conference, which occurred on October 7, 2016.

Defendants' litigation strategies and tactics resulted in Brown accruing significant but necessary pre-trial attorneys' fees.   In November 2014, Defendants served five (5) subpoenas on Brown's former employers and then-current employer seeking information with no connection or relevance to Brown's wage and hour claims against Defendants. On November 14, 2014, Brown's counsel sent a detailed letter via mail and email to Defendants' counsel, citing relevant case law, requesting that Defendants withdraw the subpoenas without the need for Brown to file a motion to quash.   Brown's counsel

invited Defendants' counsel to submit any facts or authorities that Defendants believed would permit discovery to these third parties.   Defendants' counsel provided no response to Brown's counsel on the issue.   As a result, to protect Brown from undue harassment and potential retaliation from his then-current employer, counsel for Brown was required to file a Motion to Quash the five subpoenas on an expedited basis. [Docket No. 43].   Shortly thereafter, Defendants stipulated to withdraw the five subpoenas.   [Docket No. 45].

In January 2015, Brown sought to subpoena Selliken's phone records from various mobile phone providers to demonstrate that Selliken directed Brown's work and regularly communicated with Brown outside of the hours shown on Brown's time cards. Selliken filed a Motion to Quash, seeking to prevent Brown from obtaining these relevant records.   [Docket No. 50].   Selliken's Motion to Quash raised questions on the following issues that required extensive researching and briefing: 1) The untimeliness of Selliken's Motion to Quash; 2) the untimeliness of Selliken's objection to the subpoenas; 3) Selliken's lack of standing to quash the subpoenas; 4) the lack of an expectation of privacy in phone records in possession of the third parties; 5) Selliken's failure to properly assert a claim of privilege; and 6) the relevance of the documents sought by the subpoenas. [Docket No. 52].   Defendants sought two extensions of time to file a reply in support of their own motion to quash [Docket Nos. 54 and 57], but Defendants ultimately agreed to withdraw their Motion to Quash pursuant to a simple stipulation filed with the Court.   This stipulation merely required Brown to return the phone records when the litigation concluded and to refrain from utilizing any of the phone numbers for reasons

unrelated to the litigation, both of which requirements counsel for Brown would have readily agreed had Defendants made such a request prior to opposing Brown's subpoenas.   [Docket Nos. 50, 52, 54-60, 63]

During the course of discovery, Defendants deposed eleven individuals:   Brown (deposition began on October 21, 2014 and resumed and concluded on October 7, 2015); Richard Boatman (December 18, 2014); Edward Dill (December 18, 2014); Gordon Pleus (December 18, 2014); Derrick Hagerman (October 23, 2015); Jessie Brown (October 6, 2015); Corey Bradbury (October 23, 2015); Jason Troxel (November 24, 2015); Cheryl Brown (November 24, 2014); Ryan Adamson (December 14, 2014); Clifford Stephens (December 19, 2014).   Although Defendants listed each of these individuals on their Final Witness List, [Docket No. 102], only Daniel Brown, Corey Bradbury and Ryan Adamson testified at trial, all of whom were called by Brown. Nonetheless, counsel for Plaintiff was required to prepare as if each of Defendants' witness would be called by Defendants at trial.   In addition, Counsel for Brown deposed Joseph Selliken (October 5, 2015), who Brown also called as a witness at trial.

Defendants also produced thousands of pages of discovery to Brown.   The majority of these documents, totaling more than 2200 pages, were "discovered" and revealed to counsel for Brown following the conclusion of Brown's deposition on October 7, 2015, which Selliken attended.   [Exhibit B, Declaration of Philip J. Gibbons, Jr. ¶12]. Specifically, after the Brown's deposition concluded, Selliken approached the undersigned counsel for Brown and asked whether his vehicle had a "large trunk."   Id. Selliken then proceeded to inform the undersigned counsel that he had several large

5

boxes of documents that he intended to produce. Id.   The undersigned counsel for

Brown directed Selliken to speak with his own attorney about any supplemental

discovery responses. Id.   Defendants' newly discovered documents included time

records, pay records, copies of expense receipts, expense reimbursement documents,

as well as other miscellaneous documents. Id.   These 2200 documents were produced

to counsel for Brown on November 12, 2015, on a computer thumb drive. Id.   These

documents included numerous identical copies in duplicate, triplicate and sometimes

more, which were randomly dispersed throughout the files.   Id.   Finally, many of these

"newly discovered" documents were copies of documents previously produced by

Defendants, albeit with different bates stamp numbers. Id.   According to Defendants'

counsel, the documents were produced to Brown in the same form and order that

Defendants' counsel received them from his clients.   Id.

   In February 2016, Defendants belatedly sought to disclose an expert witness,

purportedly to demonstrate that Brown's personal time logs were not in his own

handwriting and to demonstrate that they were not made contemporaneously while he

was employed.   [Docket No. 81].   Counsel for Brown initially opposed Defendants'

request, given that the trial in this matter was scheduled for April 20, 2016.   [Docket. No.

67].   After several discussions between the Parties and the Court, counsel for Brown

withdrew opposition and the Court delayed trial of the case to accommodate Defendants'

request to have their expert examine Brown's original documents.   [Docket Nos. 84-86].

Following this legal maneuvering, Defendants never hired their expert and no expert

examined Brown's original documents.   This did not stop Defendants, however, from

listing the expert on their final witness list, which required Brown to file a motion in limine to exclude his testimony.    [Docket Nos. 96 and 110].    The Parties addressed this issue during the Final Pretrial Conference held on October 7, 2016 and Defendants agreed to remove the expert's name from their final witness list.

Outside of Defendants' litigation tactics, the crux of this case involved Brown's time logs, calendars and notes showing the work he performed and the hours he worked. [Trial Exhibit. 1].    Brown's records were comprised of over 300 handwritten pages.    Id. Brown's time entries were recorded in small time increments, including overnight work that crossed from one day into the next.    In other words, the entries were not easy to read, digest and summarize.    In preparation for trial, counsel for Brown summarized the time-keeping portion of these records, which was essential in obtaining the jury verdict that was awarded.    [Trial Exhibit. 14].

This case has also been highly difficult because of Selliken's attitude and obdurate behavior throughout these proceedings.    Selliken's deposition testimony speaks for itself:

> Gibbons:      You used the term, "We bought the property
> before the tax liens were to be redeemed," who
> is the "we" that you were referring to?
>
> Selliken:      That's the royal we.
>
> Gibbons:      You'll have to explain that.
>
> Selliken:      The king refers to himself as we.    I'm the king.

[Exhibit C - Selliken Depo. p. 12, ll. 20-24]

*   *   *   *   *

Gibbons:        What's your understanding of the lawsuit that Dan has brought against you.

Selliken:       That it's a total fraud, that he made up a story that has no basis in reality.    But he claims that on the day I met him, that I was so impressed by him that I told him that he could work whatever hours he wanted to, keep his own record, and that I'd only pay him for thirty-five hours, and he claims that I promised that at some time later, when the TDK property got up and running, that I would catch up all of his unpaid pay.    I know that this is a total fabrication.    If he had even proposed such a thing for him, I wouldn't have hired him at all. There's no way that I would accept such a proposition because I had a previous problem. The first employee that I ever had a problem with made some fatuous claim to have been an abused hourly employee who worked all this overtime, and it was a practical lesson to me in the terms of our Fair Wage and Labor Standard Act in 1939 which was subsequently amended and modified by administrative rules, to the effect that I would never even consider having any such arrangement with any employee.

Gibbons:        So the lawsuit that you're referring to, I assume, that was a lawsuit brought against you by a former employee, Debra Inglert, is that correct?[1]

Selliken:       That's correct.

[Exhibit C - Selliken Depo. p. 18, ll. 24-25, p. 19, ll. 1-20]

*   *   *   *   *

Selliken:       If this goes to trial, I'm going to tell the jury

---

[1] Notwithstanding Selliken's description of Inglrert's claim as "fatuous," in <u>Osler Institute Inc. v. Englert</u>, 558 N.E.2d 901 (Ind.App. 2001), the plaintiff was awarded unpaid overtime, liquidated damages, plus attorney's fees and costs for the Osler Institute's violation of the FLSA.

8

about all of this, and if you want to put Dan Brown against me, go right ahead because you're wasting your time.

Gibbons:   There's not a question pending, sir.

Selliken:   What?

Gibbons:   I said I don't have a question pending.   You don't need to just volunteer information, but I appreciate what you're saying.

Selliken:   Well, then pend a question to me.   Please make it relevant.

[Exhibit C - Selliken Depo. p. 61, ll. 6-15]

*   *   *   *   *

Gibbons:   Go back to Exhibit Seven, please.   This document says, "I was the main contact between Dan and Dr. Selliken when Dr. Selliken was out of town.   I was also present for most of the meetings that occurred between Dan and Dr. Selliken.   Do you have any reason to disagree with that statement if it's coming from Mr. Bradbury?

Selliken:   . . . . I tell you Dan Brown is an altogether increasingly difficult employee, and this record of his working so many hours has all the hallmarks of being jimmed up.   We couldn't, even after he filed his lawsuit, we kept asking, "We want to see a record of this."   It must have taken him months to write all that stuff in such perfect handwriting to invent his story.   For you to believe this man is the height of foolishness on your part.   You must have nothing better to do.

[Exhibit C - Selliken Depo. p. 56, ll. 23-25, p. 57, ll. 1-20]

*   *   *   *   *

9

Gibbons:     Is that why you made [Brown] the manager of your maintenance facility midway ....

Selliken:     No, no, no, no, no,no,no.   That's a ridiculous question. . . . .Your client is a liar and you're going to look pretty foolish.   And I'm not a real practical person who pays off these things because it's more expensive to defend than to pay it off.   It's more costly to me to have an example of somebody like Dan Brown out there able to pull a stunt like this and get paid for it. You missed your chance for a payoff.   If you get anything, it will have to be a jury award that's upheld by the appellate court.

[Exhibit C - Selliken Depo. p. 63, ll. 18-25, p. 64, ll. 1-21][2]

But it did not stop there.   Selliken also continued this behavior throughout the trial, oftentimes in full view of the Judge and his court staff.   This included offhand comments to the undersigned counsel during the trial, as well as Selliken's requests to make statements and speak directly with Judge Lawrence while testifying during the trial. Judge Lawrence obviously rejected all such requests.

Finally, Defendants made no meaningful attempt to settle this case.   [Exhibit B - Declaration of Philip J. Gibbons, Jr. ¶13].   The Court held three settlement conferences during the course of litigation, plus a final attempt by Judge LaRue to informally settle the case prior to the Final Pretrial Conference. Id.   Notably, Defendants refused to offer any monetary settlement amount during the first two settlement conferences.   Id.   During the third settlement conference, which was not held until March 31, 2016, Defendants made a "take it or leave it" final offer in the amount of $30,000.   Id.   Finally, after the

_____

2  At the time of Selliken's deposition, Defendants had not offered any amount to settle this case.   The undersigned counsel does not know what Selliken's reference to a "payoff" meant.

trial, but prior to the Court issuing judgment against Defendants, the undersigned

counsel for Brown contacted counsel for Defendants and asked if Defendants wished to

discuss resolving the case before a personal judgment was issued against Selliken,

which would allow Selliken to avoid any negative impact on his personal credit.   Id.

Although counsel for Defendants acknowledged receipt of this email, Defendants did not

respond to Brown's invitation to discuss settlement.   Id.

## LEGAL STANDARD

A prevailing plaintiff in an FLSA and IWPS action is entitled to reasonable

attorneys' fees and costs pursuant to 29 U.S.C. § 216(b) and I.C. 22-2-5-2.

## ARGUMENT

The FLSA provides that "[t]he court in such action shall, in addition to any

judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be

paid by the defendant, and costs of the action."   29 U.S.C. § 216(b).   The purpose

behind the nondiscretionary fee-shifting provision of the FLSA is to encourage attorneys

to accept wage cases on behalf of low-wage workers where the attorneys' fees may

exceed any possible recovery.   Urnikis-Negro v. Am. Family Prop. Servs., Inc., 2009

WL 212122 at *4 (N.D.Ill. January 26, 2009).   The pre-July 2015 version of the IWPS

applicable to this case provides that when a plaintiff prevails, " . . . the court shall tax and

assess as costs in said case a reasonable fee for the plaintiff's attorney or attorneys."

I.C. 22-2-5-2.

In determining the amount of reasonable attorneys' fees, the Court should

examine the number of hours expended by Brown's counsel multiplied by a reasonable

hourly rate.   Hensley v. Exkerhart, 461 U.S. 424, 433 (1983); Eddleman v. Swichcraft, Inc., 927 F.2d 316, 318 (7th Cir. 1991) (citing Blanchard v. Berferong, 489 U.S. 87, 93 (1989).   The product of these figures yields a reasonably objective estimate of the value of plaintiffs' counsel's services, known as the "lodestar."   Hensley, 461 U.S. at 433. This reasonably objective estimate may then be adjusted at the discretion of the district court.   Id. at 434.   In doing so, the court must measure the lodestar against several factors, the most important of which is the results obtained by Brown's counsel.   Id.   "In calculating the lodestar, the Court 'need not, and indeed should not, become green-eyeshade accountants.   The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection."   Reynolds v. EOS CCA, 2016 WL 6876575 at *2 (S.D. IN, Nov. 22, 2016) quoting Fox v. Vice, 131 S.Ct. 2205, 2216 (2011).

Here, there is no dispute that Brown is the prevailing party and entitled to reasonable attorneys' fees and costs.   As demonstrated by the jury's verdict and this Court's December 1, 2016 judgment, Brown obtained virtually all requested relief.[3]

---

3  Brown's Complaint included a breach of contract claim and an unjust enrichment claim seeking repayment of $286.00 in mileage expenses submitted by Brown at the end of his employment.   Given the small monetary value of these claims, Brown agreed to voluntarily dismiss them prior to trial for purposes of streamlining the issues before the Court and jury.   Brown's counsel incurred nominal fees in asserting these claims because they were subsumed by Brown's prosecution of his FLSA and IWPS claims. Specifically, Brown's FLSA and IWPS claims relied on Brown's expense receipts to demonstrate Defendants' knowledge of his unpaid overtime.   [Trial Exhibit. 11]. Furthermore, Defendants conceded their failure to reimburse Brown for the final expense receipt he submitted in Trial Exhibit 8, in which Defendant Selliken premised reimbursement of Brown's unpaid mileage submission on Brown providing a full release of any and all claims against Defendants.   Brown also utilized Trial Exhibit 8 in support of the prosecution of his FLSA and IWPS claims to show that Defendants never offered to pay Brown for unpaid overtime.   Brown's voluntary dismissal of these claims should not be viewed by the Court as diminishing the excellent result obtained by Brown.

**A.     As the Prevailing Party, Brown is Entitled to Recover Reasonable Attorneys' Fees and Costs.**

As a preliminary matter, an award of attorneys' fees to a prevailing plaintiff is "mandatory" under Section 216(b) of the FLSA and Section 22-2-5-2 of the IWPS.   The "prevailing party" is the party who succeeds "on any significant issue in litigation which achieves some of the benefits the parties sought in bringing the suit."   Hensely, 461 U.S. at 433.

Here, the Jury found that Daniel Brown was entitled to payment for 5,471.42 hours of unpaid overtime worked during the 149-week period December 11, 2010 through October 22, 2013.   [Exhibit A, Verdict Form].   Based on these figures, the Jury found that Brown worked an average of 36.72 overtime hours per week (5,479.42 overtime hours / 149 weeks).   This is equivalent to working an average of 76.72 total hours per week (40 regular hours + 36.72 overtime hours) during each week of Brown's employment with Defendants.   For the 84 week time period December 11, 2010 through July 21, 2012, the Jury found that Brown worked an average of 51 hours of overtime each week or the equivalent of a 91 hour average workweek (40 regular hours + 51 overtime hours].   Not surprisingly, these findings coincide directly with Trial Exhibit 14, which summarized the hours Brown recorded in his logs. For hours that were not included on Trial Exhibit 14, the Jury extrapolated an equal number of hours based on the time period at issue.   The Jury also found that Brown worked 160 unpaid regular hours in violation of the IWPS, which is every unpaid regular hour Brown asserted.   Id.

---

Instead, dismissal of these claims served to reduce the length of the trial, as well as the amount of trial preparation necessary for the Court and all parties.

The undersigned counsel for Brown believes this FLSA verdict is unprecedented in the Southern District of Indiana.   The Jury unequivocally awarded Brown all unpaid overtime hours and unpaid regular hours that Brown's counsel requested during final argument.[4]   This verdict unquestionably makes Brown the prevailing party for purpose of attorneys' fees and costs and represents an extraordinary jury award in the Southern District of Indiana.

**B.   Brown's Requested Attorney's Fees Are Reasonable and Should Be Fully Awarded**

    **1.   Brown's Counsel's Hourly Rates Are Reasonable**

"[W]hen parties that do not bear the burden of proof at trial mount a spirited defense of the case, they can hardly complain when their adversaries spend at least as much time and effort to surmount the defense, nor can they validly object to paying the adversaries' reasonable fees when the defense fails."   Catalan v. RBC Mortgage Co.,

---

4  During trial, Defendants made much ado about Brown's "estimate" that he worked "between 77 – 126 hours each week," which Brown provided in response to Defendants' Interrogatory requests and during his deposition.   Regarding this estimate, Brown always directed Defendants to his log books when answering this question.   These log books were produced to Defendants in October 2014.   Specifically, from the inception of this case through trial, Brown repeatedly stated that the number of hours he worked could be found by reviewing these log books.   Incredibly, during closing arguments, counsel for Defendants admitted that Defendants never attempted to summarize the hours set forth in the log books.   Instead, Defendants simply latched-on to the "77-126" hour estimate, which Brown made clear was an estimate that was subject to the hours shown in his log books.   Moreover, the Jury found that Brown worked an average of 76.72 hours per week.   Although the summary of Brown's log books showed there were weeks that Brown worked less than 77 hours, this 76.72 hours per week average is substantially equivalent to Brown's low-end estimate of the number of weeks he worked each week. In addition, the summary of Brown's log books show he worked in excess of 100 hours during several weeks of his employment.   Ultimately, however, the Jury found that Brown worked the number of hours he recorded in his log books, and extrapolated an equal number of hours worked for the time periods for which no log books existed, which is entirely consistent with Brown's pre-trial and trial testimony.

2009 WL 2986122 at * 5 (N.D. Ill. Sept. 16, 2009); Pisut v. Pasavare, 2005 WL 1138638

at *1 (N.D.Ill. April 29, 2005) ("it is well known that in most cases it takes more time to

prepare and try a case on the plaintiff's behalf than it takes to defend.").

　　　As listed in the table below, Brown's Counsel's lodestar is 161,044.50, based on

572.60 hours litigating and trying this case to verdict.　　[Exhibit B, Declaration of Philip J.

Gibbons, Jr. ¶10].

| Name | Hourly Rate | Total Hours Billed | Amount Billed |
|------|-------------|--------------------|---------------|
|  |  |  |  |
| Philip Gibbons | $350 | 10.2 | $3,570.00 |
| Philip Gibbons | $385 | 14.40 | $5,544.00 |
| Philip Gibbons | $400 | 39.70 | $15,880.00 |
| Philip Gibbons | $415 | 120.30 | $49,699.50 |
|  |  |  |  |
| Robert Hunt | $200 | 51.30 | $10,260.00 |
| Robert Hunt | $215 | 159.60 | $34,314.00 |
| Robert Hunt | $230 | 107.50 | $24,725.00 |
| Robert Hunt | $245 | 69.60 | $17,052.00 |
|  |  |  |  |
| Combined Total | $281.25 | 572.60 | $161,044.50 |

　　　Brown seeks hourly rates as follows:　　$350 - $415 per hour for Philip J. Gibbons,

Jr. and $200-245 per hour for Robert J. Hunt.　　For purposes of determining a

reasonable attorney's fee, the hourly rates must be calculated in accordance with the

prevailing market rate in the relevant community.　　Blum v. Stenson, 465 U.S. 886,

896-97 (1984).　　The "community" in this case does not mean simply the local

geographic community where the matter was tried.　　The Court is also free to examine

the national market in a specific area or specialization.   Chrapliwy v. Uniroyal, Inc., 670

F.2d 760, 768-69 (7th Cir. 1982);   Louisville Black Police Officers Org. v. City of

Louisville, 700 F.2d 268, 278 (6th Cir. 1983); Hadix v. Johnson, 65 F.3d 532, 535 (6th Cir.

1995) ("When fees are sought for an out-of-town specialist, courts must determine (1)

whether hiring the out-of-town specialist was reasonable in the first instance, and (2)

whether the rates sought by the out-of-town specialist are reasonable for an attorney of

his or her degree of skill, experience, and reputation.")

     Here, the Court should look outside of the Terre Haute community when

determining the applicable "prevailing market rate" because a "prevailing market rate" for

plaintiff-side employment attorneys does not exist in Terre Haute.   As set forth in the

Declaration of Indianapolis employment attorney Kevin Betz, employment-law plaintiffs

throughout the state of Indiana regularly retain Indianapolis counsel because there are

very few attorneys outside of the metropolitan Indianapolis area with significant

employment law experience.   [Exhibit D, Declaration of Kevin W. Betz, ¶ 19]   Similarly,

Gibbons Legal Group, P.C. is regularly contacted and retained by individuals who live

outside of the Indianapolis metropolitan area because they are unable to find

experienced employment law practitioners in the towns and cities where they reside.

[Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶9].   As a result, Gibbons Legal Group,

P.C. represents employees throughout the state of Indiana and files lawsuits in the

appropriate federal and state courts relevant to where these individuals live and work. Id.

Accordingly, it is reasonable and necessary for employment law plaintiffs in Indiana to

hire Indianapolis employment law attorneys in order to obtain experienced and qualified

representation.    The Court should utilize the market rate for Indianapolis plaintiff-side employment attorneys in determining a reasonable billable rate.

The billable rates sought by Gibbons Legal Group, P.C. are reasonable based on the degree of skill, experience, and reputation of Mr. Gibbons and Mr. Hunt.    Mr. Gibbons is the founding attorney at Gibbons Legal Group, P.C., located in Indianapolis, Indiana. [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶2].    Mr. Gibbons also owns and operates Phil Gibbons Law, P.C., located in Charlotte, NC.    Id.    Both firms limit representation to cases involving plaintiff-side employment law.    Id.    Since 1996, Mr. Gibbons' law practice has focused almost exclusively on employment law. Id.    Since 2007, Mr. Gibbons' employment law practice narrowed even more, focusing primarily on representing employees in wage and hour disputes with their employers, including complex multi-plaintiff wage and hour litigation. Id.    Mr. Gibbons has handled wage and hour lawsuits in state and federal courts located in Indiana, Illinois, Michigan, Kentucky, Georgia, Texas, and North Carolina.    [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶¶1 and 3].    Mr. Gibbons has been selected for inclusion in the 2015 and 2016 editions of Indiana Super Lawyers in the category of Employment Litigation – Plaintiff.    He was also recognized in the 2015 and 2016 editions of The Best Lawyers in America in the area of Labor and Employment Law.    [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶4].

Mr. Hunt is an associate attorney at Gibbons Legal Group, P.C.    Since joining Gibbons Legal Group, P.C. in January 2014, Mr. Hunt has focused his legal practice exclusively on representing employees in wage and hour disputes with their employers,

including multi-plaintiff wage and hour litigation.   Mr. Hunt has obtained several favorable rulings on substantive motions and dispositive issues in wage and hour cases since joining Gibbons Legal Group, P.C.   [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶7].

Gibbons Legal Group, P.C. reviews and adjusts hourly attorney and staff billable rates on October 1 of each year.   [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶5]. When this case was filed in December 2013, Mr. Gibbons' hourly billable rate was $350.00 per hour.   Id.   In Furgason v. Furrer, 2014 WL 5704693 at *2 (S.D. IN, November 5, 2014), Judge Dinsmore utilized Mr. Gibbons' $350.00 hourly rate (effective October 1, 2013 – September 30, 2014) as the "market rate" for an Indianapolis plaintiff-side employment lawyer.   Since then, Mr. Gibbons' hourly rate increased to $385.00 on October 1, 2104; to $400.00 on October 1, 2015; and to $415.00 on October 1, 2016.   [Exhibit B, Declaration of Philip J. Gibbons, Jr. ¶5].   When Mr. Hunt joined Gibbons Legal Group, P.C. in January 2014 his hourly rate was $200.00 per hour. During the time period October 1, 2014 to October 1, 2015, Mr. Hunt's hourly rate was $215.00 per hour.   During the time period October 1, 2015 to October 1, 2016, Mr. Hunt's hourly rate was $230.00 per hour.   On October 1, 2016, Mr. Hunt's hourly rate was raised $245.00 per hour.   [Exhibit B, Declaration of Philip J. Gibbons, Jr., ¶7].

The rates sought by Brown's counsel and their staff are reasonable and within the range of rates for comparably experienced attorneys and staff in the relevant market. As set forth in the Declaration of Indianapolis employment attorney Kevin Betz, the hourly rates for Phil Gibbons and Rob Hunt are lower than the hourly billable rates

18

charged by employment attorneys in the Indianapolis market who have comparable skills and experience.   [Exhibit D, Declaration of Kevin W. Betz, ¶¶21-23]

        In addition to the Declarations of Kevin W. Betz and Philip J Gibbons, Jr., the U.S. District Court for the Southern District of Indiana has approved the hourly billable rates charged by Mr. Gibbons and/or Mr. Hunt in several FLSA cases during the past several years.   For example, Judge Barker recently approved a contingency award of attorneys' fees in an FLSA settlement where Robert J. Hunt and Philip J. Gibbons, Jr. billed their respective time at $200.00/hr and $400.00/hr.   See Hayes et al. v. J.C. Ehrlich Co., Inc., Case No. 1:14-cv-01428-SEB-MJD, Docket No. 72.   FLSA Contingency fee awards for Gibbons Legal Group, P.C. have also been approved by Courts in this district as "fair and reasonable" using Mr. Gibbons' and Mr. Hunt's hourly billable rates in the following Southern District of Indiana cases: Chris Kelly v. Skybus, LLC et al, Case Number 1:16-cv-00107-TWP-MPB, Docket Nos. 17 and 18 (Philip Gibbons $400.00 and Robert Hunt $230.00); Elexius Corbin, et al v. Revere Plastics Systems, LLC, Case Number 4:16-cv-00038-TWP-DML, Docket Nos. 8 and 9 (Robert Hunt $230.00/hr); Logan C. Bazzell-Ferree, et al v. Revere Plastics Systems, LLC, Case Number 4:15-cv-00008-DML-TWP, Docket Nos. 62 and 63 (Philip Gibbons $385.00, Robert Hunt $215.00);   and Amber Boyd, et al v. Tchopstix, Inc. et al , Case Number 1:12-cv-01547-TWP-DML, Docket Nos. 38, 52, 56, and 57 (Philip Gibbons $330.00 - $385.00 and Robert Hunt $200.00 - $230.00).

        In sum, Brown's Counsel's rates are comparable to (or lower than) other Indiana plaintiff-side employment law attorneys with similar experience and skill and should be

approved as the "prevailing market rates" for this case.

### 2.    The Time Expended By Brown's Counsel Is Reasonable

"A fee petitioner is expected to exercise billing judgment by winnowing down the time actually expended to the time reasonably expended."   Grubbs v. Andrew & Cox, P.C., 2016 WL 3902591 at *3 (July 18, 1016 S.D.IN) quoting Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 550 (7th Cir. 1999).

Here, the time detailed in the Billing Record for this case reflects the following reasonable activities: drafting pleadings, preparing and responding to discovery, intensive document and data review and summarization, motion practice, depositions, court appearances, damage analysis, telephone conversations and correspondence with opposing counsel, telephone conversations and correspondence with the Court, preparation for trial by jury, and post-trial matters, including Brown's fee petition. [Exhibit B, Declaration of Philip J. Gibbons, Jr., Exhibit 1].

In preparing this fee petition, the undersigned counsel decreased or deleted attorney billings that he deemed duplicative, administrative in nature, and/or unrelated to Brown's lawsuit (i.e. all billings related to Brown's unemployment hearing).   [Declaration of Philip J. Gibbons, Jr. ¶10].   In doing so, the total fees billed was reduced by more than $5,000.   In addition, although typically compensable, Brown's counsel did not bill for time spent maintaining the file, time spent for numerous attorney conferences between Mr. Gibbons and Mr. Hunt to discuss case strategy, or time spent by Mr. Gibbons reviewing court docket entries. Id.   Finally, litigation tasks in this matter were delegated between Mr. Gibbons and Mr. Hunt efficiently.   The time entries Brown

submits to the Court are reasonable and were necessary for the successful prosecution

of this action.   Indeed, the blended hourly rate for Mr. Gibbons' and Mr. Hunt's time over

the 3-year period this case was litigated is $281.25/hour.   Id.

**C.   Brown Is Entitled to an Award of Taxable Costs and Out-of-Pocket Litigation Expenses**

Pursuant to 28 U.S.C. § 1920, Brown seeks an award of costs his counsel

incurred while successfully prosecuting this case.   Brown seeks $1950.12 in taxable

costs, as set forth in his Bill of Taxable Costs, which will be filed by separate motion.   In

addition, Brown seeks an award of certain out-of-pocket litigation expenses incurred

while successfully prosecuting this case.   Specifically, Brown seeks reimbursement for

mileage, travel expenses, meals, and lodging in the amount of $2,062.72, which are

detailed in the Declaration of Philip J. Gibbons, Jr., Exhibit 2.   Plaintiffs in an FLSA

action are entitled to recover costs incurred in prosecuting their claims.   29 U.S.C. §

216(b).   Costs under fee-shifting statutes such as the FLSA include all reasonable

out-of-pocket expenditures.   Shorter v. Valley Bank & Trust Co., 678 F.Supp. 714, 726

(N.D. Ill. 1988); Kabore v. Anchor-Staffing, Inc., 2012 WL 5077636 at *10 (D.Md. Oct. 17,

2012).   Total costs sought by Brown are $4,012.84.

<u>**CONCLUSION**</u>

For the reasons stated above, the Court should grant Brown's Motion for

Attorneys' Fees and Costs and award attorneys' fees in the amount of $161,044.50, and

award reimbursement of litigation costs and expenses in the amount of $4,012.84.

Respectfully submitted,

s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr., (#19353-49)
Robert J. Hunt (#30686-49)

GIBBONS LEGAL GROUP, P.C.
3091 E. 98th Street, Suite 280
Indianapolis, Indiana 46280
Telephone:   (317) 706-1100
Facsimile:   (317) 623-8503
E-Mail:   phil@gibbonslegalgroup.com
           rob@gibbonslegalgroup.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served this 14th day of December, 2016, by way of the Court's Electronic Case Filing system upon the following counsel of record:

Steven L. Blakely
sblakely@acton-snyder.com

Nicolas J. Boileau
nick.boileau@acton-snyder.com

s/ Philip J. Gibbons, Jr.
Philip J. Gibbons, Jr.

22